IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

APRIL D. JACKSON,

   Plaintiff,

v.              Civil Action No. 3:04-0473

AMERICAN ELECTRIC POWER
SERVICE CORPORATION d/b/a
AMERICAN ELECTRIC POWER and
MICHAEL STEPHENS,

   Defendants.

## MEMORANDUM OPINION AND ORDER

Pending is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons stated below, the motion is **GRANTED**.

## I. PROCEDURAL HISTORY

On April 29, 2004, the plaintiff April D. Jackson (hereinafter "Jackson") filed a complaint against defendants American Electric Power Service Corporation d/b/a American Electric Power (hereinafter "AEP") and Michael Stephens (hereinafter "Stephens"), individually and as an agent of AEP, in the Circuit Court of Cabell County, West Virginia, alleging retaliatory discharge and intentional infliction of emotional distress.  Specifically, she alleges in the first count that Stephens harassed and discharged her from AEP in retaliation for filing a grievance concerning AEP's new travel policy for administrative associates.  In the second count, she alleges that AEP's requirement that she sign the severance and release of all claims agreement in order to receive severance pay was against public policy and violated the Employee

Page 1 of  45

Retirement Income Security Act (hereinafter "ERISA") and that such conduct was atrocious, intolerable and so extreme and outrageous as to exceed the bounds of decency causing her emotional distress.  In her prayer for relief, Jackson seeks her "severance pay compensation in the amount of $20,100.46, award her damages for lost wages, related out of pocket expenses, emotional distress, and punitive damages, attorney's fees and costs associated with the filing of this action, and for such other and further relief as this Court deems fit and just."  (Notice of Removal Ex. Comp. at 6.)  On May 17, 2004, the defendants removed this matter to federal court, asserting jurisdiction pursuant to § 514(a) of ERISA, 29 U.S.C. § 1144(a).

On February 7, 2005, the defendants filed a motion for summary judgment.  Jackson filed her response on February 18, 2005, and the defendants filed their reply on March 8, 2005.

## II.    STATEMENT OF FACTS

The following resume of facts is admittedly prolix, but deemed justified given the complexity of the issues herein.  Jackson was hired by AEP on December 1, 1985.  She was assigned to AEP's Milton office as an administrative associate and was primarily responsible for scheduling the work orders of line technicians and for recording their time sheets.

On June 14, 2001, Scott Chambers, Jackson's supervisor at that time, evaluated her work performance.  He rated her as "exceeds" in the following categories: related experience, specific training, job performance, job skills, adaptability/flexibility, client focus, communication, creativity/continuous improvement, initiative, planning & organizing and teamwork/collaboration.  He rated her as "meets minimum" in the categories of education and understanding the business and competition.  He also commented that she was very good at handling multiple tasks.

According to the affidavit of Stephens, also one of Jackson's supervisors, AEP reorganized its administrative associates and created a centralized Work Scheduling Team (hereinafter "WST") in August of 2001.  As part of the reorganization, all of AEP's administrative associates, including Jackson, were assigned to work out of the Charleston office.  During the transition, however, some associates in the outlying offices, including Jackson, were allowed to work at their original office assignments.

In her brief, Jackson admits that John Hudson, her direct supervisor, informed her by telephone on October 16, 2001 that all district clerks would be under Stephens and him effective immediately and would be part of the WST.  She also testified at her deposition that he informed her that she would remain in Milton doing the same work and that nothing would change.  (Mot. Summ. J. Ex. A at 71.)

On October 29, 2001, Jackson received the following e-mail from Stephens:

In talking with April she is now going to assume the primary duties of time keeping for the Chas and Pikeville District Techs.  Her and Joe are switching primary responsibilities.  April and I talked and she came in on her own and finished up some time sheets.  This is "A" player material and please copy this and place in her file for her JPR time.  April thanks so much for having a great attitude and skill set.  Thanks for not listening to those who said don't do it it's not your job.  Were [sic] a team and I do appreciate your winning attitude, it does make a difference.

(Response Ex. D of Ex. 1.)

On January 29, 2002, Joe Anderson (hereinafter "Anderson"), an administrative associate assigned to AEP's Milton office, was requested to go to Charleston to work a storm.  He used an AEP vehicle to travel to Charleston.  The following day, Stephens informed Anderson that he could no longer use a company vehicle to travel to Charleston.  Also on the 30th, Jackson attended training in Charleston and also took a company vehicle.  On January 31, 2002, Jackson

sent the following e-mail to Stephens at 8:30 A.M.:

> The past two days, Tuesday and Wednesday, I had training in other AEP locations
> and I drove a company vehicle.  I have worked at AEP for 16 years and each time
> that I have had training or meetings in any location other than Milton, I was given
> a vehicle.  Even when I worked in Huntington/Milton District, when driving from
> Milton to Huntington.  According to the contract, which I know we are not union,
> (but has always been used it [sic] as a guideline), and the Management
> Information and Policy Manual, when traveling on company business we are to be
> paid travel time and be furnished a company vehicle or be paid mileage.  It has
> been brought to my attention that we can no longer doe this?  Is this so?  Does
> this apply to all employees or just Department Assistants?

(Mot. Summ. J. Ex. D.)[1]

> Stephens e-mailed the following reply to Jackson:

> It has been the business decision for our group that we will not pay mileage or
> provide vehicles for the [above] type of work.  I also reaffirmed this with Larry
> Jackson.  John is set to cover this in a group conference call that he is setting up
> to cover various topics.

(Mot. Summ. J. Ex. D.)[2]

> In response to Stephens's reply, Jackson sent the following e-mail to him at 10:12 A.M.:

> I would like to file a grievance.  Due to the fact that this has been a past practice
> and it is a written policy.  The Department Associates are being discriminated
> against in comparison to the rest of the AEP employees.

> I come to work and work hard.  I have never refused to do any duty that I have
> been given.  I have gone to all training classes available to do my job more
> effectively and efficiently.  I have been through many changes like the rest of the
> company and I try to do my best at whatever I do.  But, I do not agree with being
> treated differently than the rest of the employees of AEP, especially when it is a
> written company procedure.  As you know, I have came in on my own time
> working on duties that were not mine, so the work would get done.  I have good

---

[1]In her deposition, Jackson acknowledge that she authored the e-mail.  (Mot. Summ. J.
Ex. A at 75.)

[2]In her deposition, Jackson acknowledge that she received the reply from Stephens.
(Mot. Summ. J. Ex. A at 74-5.)

work ethics and responsibilities and feel that I have gone the extra mile to be a
good employee, so I would like to be treated the same.

(Mot. Summ. J. Ex. E.)[3]

Stephens e-mailed the following reply to Jackson at 11:11 A.M.: "I received the E mail

and will get back to you soon on this issue. . ."  (Mot. Summ. J. Ex. E.)

On February 1, 2002, Stephens and Debbie Tygrett met with Jackson and Anderson to

discuss reporting headquarters and travel.  Accordingly to his affidavit, Stephens drafted the

following two documents in an effort to summarize the topics discussed at the meeting:

Work Scheduling Team Associates Positions

The purpose of this meeting is to convey to you the way in which the Charleston
District Work Scheduling Team is organized and will operate.  All Associates in
the Charleston District are a part of the Charleston District Work Scheduling
Team.  This Work Scheduling Team has its headquarters and reporting location as
Charleston.  The core processes are currently staffed out of the Charleston Office
whereas a temporal decision has been made by WST management to allow some
duties to be staffed by Associates in the outer offices (Huntington, Milton,
Beckley).
This outer office staffing does not indicate the fact that these outer offices are the
Associates reporting locations or headquarters but the fact remains that
Charleston remains the headquarters and or reporting location.  The temporal
staffing of Associates in some outer offices is at the discretion of the Supervision
of the WST and with the full consent of the Associates, which works in that outer
office.
This means that whereas the reporting place or headquarters for all our Associates
is Charleston we have as a pure matter of temporal convenience to the employee
allowed them to work out of an outer office which may be closer then reporting to
Charleston.  The Associates that are performing duties in the outer offices are
expected to drive into Charleston when requested by their supervision when the
workload or needs present itself.  This drive of a temporally staffed Associate in
an outer office to Charleston is to be considered as simply reporting to their
headquarters or reporting location and thus no mileage reimbursement or
company vehicle is to be provided.

---

[3]In her deposition, Jackson acknowledge that she authored the e-mail.  (Mot. Summ. J.
Ex. A at 9.)

(Mot. Summ. J. Exhibit B-1.)

> On 2/1/02 Debbie Tygrett and I went to the Milton Office to talk with Joe
> Anderson and April Jackson.  We talked to them together.  Joe said that no one
> ever talked to him about the job he has and about the mileage deal.  April said that
> John talked to her over the phone but not in person.  Afterward I talked with John
> and he indicated that he talked face to face with both April and Joe after I asked
> him to go down and do so.  John said that he for sure discussed that they were part
> of the WST and that Chas was the headquarters and that they would have to drive
> in on a as needed basis.  But he didn't really recall stressing the no mileage or
> company car.  Both April and Joe continually commented on the way that Scott
> used to allow vehicles and pay mileage.  Debbie and I stressed the way that we
> are staffed and organized.
>
> We also talked this day with Tina Pullen at the Hgtn office.  She at first stated that
> no one told her about the job and mileage deal, but when I confronted her about
> the fact that I did and explained to her the rationale she then said that she
> remembered.  He [sic] main concern was that we should pay mileage for training
> when she has to come to Charleston.
>
> On 2/4/02 I talked with Debbie over the matter of "comp time", working through
> lunches, and doctor appointments.  Basically there is no such thing as comp time
> for nonexempt employees.  Also working through lunch times is not a practice we
> should adhere to.  Also doctor's appt is 2 hours and code 116.  Time outside of
> that then should be coded as either vacation or 09 no pay.
> I discussed this Larry Jackson.

(Mot. Summ. J. Exhibit B-2.)

Accordingly to their affidavits, prior to February 1, 2002, Jackson, Anderson and Tina

Pullen, an administrative associate assigned to AEP's Huntington office, were not informed that

their reporting headquarters was Charleston, West Virginia.

On February 26, 2002, Jim Perry, John Skidmore and Stephens met with Anderson and

Jackson at AEP's Milton office.  According to his affidavit, Stephens drafted the following in an

effort to summarize the topics discussed at the meeting:

> On 02-26-02 John Skidmore, Jim Perry and I met with the following individuals:
>
> 1st

Tina Pullen and Nancy Turley at the Huntington Service Center at approx 8:30am. Jim chaired the meeting and discussed with them what he found and how we would proceed. He found that all 4 off [sic] the WST Teams operate and are logistically organized differently so as to accommodate their respective territories. He agreed that he would talk with Larry Jackson further to see if all teams will stay this way or if there will be a move to a more consistent look between the 4 teams. But he reiterated that each business unit manager, such as myself, could operate each district unit as they see fit as long as they are far [sic] in the respective units. In other words I can be different then the others but that I need to be fair and consistent in my operations. So he informed them that he is here today to discuss the "Charleston District WST" and not the Region.

He informed them that we would look backward from today and then from today forward. In regard to this forward look he informed them that their headquarters is Charleston, Virginia Street at this time and soon to be North Charleston due to core process move. At this time management has decided that it can make certain accommodations for limited number of personnel in the noncore positions and at the employees request to leave them working remotely in the various outer offices such as Huntington, Milton and Beckley. But with this temporal allowance is the fact that they must agree to drive to Charleston (their headquarters) whenever management deems a need, from infrequent to full time, and that they will not be compensated for mileage or be provided a company vehicle.

. . .

In regards to the backward look Jim and I agreed to pay mileage for any of these associates who did not understand this matter when the job offer was made during the last reorganization. I reiterated that they needed to be honest and upfront [sic] in this regard. If they understood they don't submit for it and if they didn't then I would pay for it.

It was also discussed that if they were asked to drive from the remote office to some other remote office other then Charleston at our request then we would determine if that office was outside the 30 mile radius of Charleston and pay mileage from Charleston. Example Nancy going to Milton at our request. Since Milton is 32 miles from Charleston then I would pay her mileage. But we also discussed that after the move to No Chas that Milton will be at 29 miles and no reimbursement.

Jim also brought up the issue of "comp time" which is really a rearrangement of their schedules in a workweek to accommodate some personal need. I agreed that I would look at this issue on an individual basis. I agreed that we can work with our people as long as the system is not abused. Example: needing to work through lunch one day to be able to leave a half hour early to pick up a child. Any time not worked on one day must be made up that same workweek. Example: Employee needs to take 2 hours off due to child being sick at school and having to pick them up. That employee will be allowed to make up that 2 hours in the same workweek or take vacation. Once again it was emphasized that this was on a case-by-case basis and with management approval.

The meeting overall went well with no one being loud or visibly upset.

We then drove to Milton and meet [sic] with Joe and April.  Jim discussed the same line items as above in a scripted type of format.  After informing them about the fact that Charleston is their headquarters and what all that means as mentioned above, he asked if they had any questions.  Joe asked about parking if they come up and I informed him that I would give whoever I brought up a mall pass to park just like the other associates.  April asked if the Line DLC's were apart of this team and if their headquarters is Charleston.  I said that yes they are a part of the WST and would be considered just like the associates in this regard.  (It was part of the original vision to have all the DLC's report to Va St).
In regard to the backward look and possible misunderstanding and mileage reimbursement for that.  April said that she had never come to Charleston and thus no need for this and Joe said he had come up during some storm trouble a couple of times but that each time he had a company vehicle and so no need for reimbursement.  As in the other meeting no visible or vocal problems.

. . . .

(Mot. Summ. J. Ex. B-3.)

According to Anderson's affidavit, he was informed at the February 26th meeting that his reporting headquarters was Charleston even though he was working in Milton, that he would not receive mileage or paid travel time for traveling to Charleston and that he would have to use his own vehicle to travel to Charleston or any other job location.

On March 14, 2002, Jackson sent the following e-mail to Mr. Hudson at 8:36 A.M.:

After going home yesterday and discussing helping out in Charleston with Andy, I do not mind helping to get work caught up.  But, I would like to know how long this will be for.  Will this be for a couple of weeks or for a long period of time.  I am hearing this is an indefinite arrangement.  When meeting with Jim Perry, John Skidmore, and Mike Stephens two weeks ago, Mike said we would be working in Charleston less now than in the past, (I know I have not worked up there until this time) but he said, since Sherry was coming back it would not be necessary for the district clerks to work in Charleston just to jerk us around.  If there are reports that need worked on, why is it necessary to drive to Charleston to do them?  In Gene Jenson's initial meeting, he said that if work could be done virtually employees would not be relocated, and anything that we do, can be.  I am sure any of the district clerks would be happy to help out in this way.  I need and want to know what the intentions of this arrangement are.  Also, as Joe brought up

yesterday, while the district clerks are working in Charleston, who will be working in the district to do our work?  It seems like the same scenario that we just went thru, when the core group in Charleston needs help, it is covered, but the district do not get the same in return.  It sounds like a priority is being made to the core group in the WST in Charleston and the district work is secondary.

I live and work in Milton (built my house in Milton because I work here and travel not required) and my children are in Huntington during the day, while I work and they are my #1 priority.  If I am in Charleston and something happens to them, I cannot get to them like I should.  Also, this would make me driving from Milton to Huntington then to Charleston in the morning and from Charleston to Huntington and back to Milton each day.  Again, as I have said to Mike before, I was not offered a job in Charleston, I was offered a job in Milton and accepted, I have no interest in working in Charleston on a prolonged or permanent basis.  So, I am not trying to be difficult or hard to get along with, this is something I need to know.

(Mot. Summ. J. Ex. I.)[4]

On April 19, 2002, Jackson sent the following e-mail to Mr. Hudson at 12:56P.M.:

FYI to keep you up-to-date.

Due to the fact, that I have been doing the real time updates for the technicians and I have to retrieve each one from the voice mail in Huntington, (it is a lengthy process - writing each one down then having to pull it up), plus all of the other required everyday/routine tasks, I have not been able to work on the technician time this week.  I have been coming in early, working thru lunch and staying late, to keep the tech updates current.  So, while I am in Charleston next week there will be two weeks of time to be keyed in.

(Mot. Summ. J. Ex. J.)[5]  Mr. Hudson responded to Jackson's e-mail as follows at 2:50 P.M.:

April: we have discussed with you the importance of keeping the time up to date but we will take care of this time entry.  I had discussed your vacation with you but there was no mention of you being this far behind on your Tech time.

---

[4]In her deposition, Jackson acknowledged that she authored this e-mail.  (Mot. Summ. J. Ex. A at 79.)

[5]In her deposition, Jackson acknowledged that she authored this e-mail.  (Mot. Summ. J. Ex. A at 144-45.)

You mentioned below you have been coming in early and working thru lunch and staying late.  We have also discussed with you that <u>prior approval is needed for working overtime</u> and we do realize that it may be necessary at time to work overtime but again, approval is needed in advance for this and, to may [sic] knowledge, you have not asked for this approval.  We shall, of course, pay you for the overtime worked so I am stating that you need to turn this overtime in as worked.  In your position, there is no uncompensated overtime.  I am again stating that you need to ask for this approval in advance when it may become necessary to work overtime.

Thanks,
JLH

(Mot. Summ. J. Ex. J (emphasis in original).)  Jackson then replied to Mr. Hudson as follows at

3:14 P.M.:

First of all, you told me on April 9th at 9:00 AM that my priorities this week are as follows: 1) Technician Real time updates 2) Technician Time 3) District Work. This is what I have done with the exception of doing district work that cannot be avoided.  When the phone rings, someone is on the radio, doorbell rings, or someone is standing in front of you asking for your assistance, this cannot be avoided.  (I thought I was district support) I do know the importance of keying in the time, (I have been a timekeeper for many years and have always gotten everyone paid) but when you are given a direct order of priorities, the importance has been changed.  When you was [sic] down here on April 2, you witnessed all the interruptions that you received in this office.  You cannot expect me to do three employees jobs without any overtime at all, even with overtime it is impossible.  I cannot talk to the technicians one on one, due to the phone problem. So, that makes it even more difficult, as I mentioned below.  When Tina is doing updates, she talks to the technician, she updates while talking to them.  That cuts down on time, especially when you cannot hear the message and have to replay them many times.

When one person is absent in the core WST, someone is pulled out of the district offices, so all of our work either lays until we get back or it is given to someone else in the district to be loaded down and a hardship is made on the district clerks, so everyone at Virginia street can get a "break".  We are traveling to Charleston to do work that can be virtually done "anywhere."  I can do my work more effectively and efficiently from my workstation and any of the work can be. There is less stress involved and there is a major safety factor, I know that this safety factor is while we are driving to and from Charleston, and it will not count against anyone's safety record, but lives and families are involved.  What about the district clerks?  This happened the last time that Joe Anderson was pulled out

of Milton, sent to Charleston, and Bernard's work was not pulled for the crews, where I had to key in all the time.  (At that time, time was a priority).  I got the blame for that also, but I had already notified you of the situation by e-mail, and received no reply.

Second of all, I have turned in overtime before, (just the last pay period and others) and nothing was said.  I do know that clerks in Charleston (Virginia St.) have worked plenty of overtime and I have been there when "permission" was not asked.  I have work a minimal amount of overtime, no more that [sic] 30-40 at a time.  I feel I am being singled out again.  Ever since I filed a grievance regarding travel on company time, I have been singled out or harassed (however you want to say it).  If you feel that you need to know my job abilities and how responsible that I am, you may talk to all the people that I work with and I am sure they will be perfectly honest.  I have worked in Milton for years; expedited, took all customer calls, worked all the trouble, put all w/o's together, did all the time for lineman and technicians, and many other duties and never had any help.  I was never criticized for working over a half hour or so.

As far as my vacation.  My daughter has a doctors appointment, which I had e-mailed you about, and talked to you about before I ever knew anything about working in Charleston next week.  I asked for vacation on Wednesday, because I cannot drive to Huntington, then to Charleston by 7 AM and then turn around and drive back to Huntington and have her to the doctor by 10:15 AM then drive back to Charleston and then back to Huntington at the end of the day then return to Milton.  On Wednesday morning, you called me to discuss her doctors appointment and just to let you know how I was going to work my schedule to cover for the time that I would be gone.  At that time, I mentioned to you, that I had been starting early, working lunches, and staying late, to keep up the real time updates, that coming in early and staying late next week (for her appointment) wouldn't be anything different.  Again, nothing was said about overtime.

I, along with others, have been putting up with alot [sic] lately.  As Mike Stephens said in our, "Region Vision Structure," meeting, we need to each be leaders.  I do not feel that is what is wanted under certain supervision.  Also, I have heard "take ownership of your job," I feel this is only used when certain "disciplines" are handed out.  On the back of our employee id cards, the second statement under AEP is: employee oriented.  I have yet to see that in the last seven months, especially in the district offices.  Our work is secondary to the scheduling team at Virginia Street and then we are criticized for not getting work done when we are "specifically told to do something else".

We have a very serious problem and I want a solution.  So, I want a meeting with Larry Jackson, one-on-one.  I would like this to take place in a timely matter.

By the way, I am doing this e-mail on my own time, there will be not [sic] overtime involved.

Thank you.

(Mot. Summ. J. Ex. J.)[6]

On April 29, 2002, Jackson sent the following e-mail to Mr. Hudson and Stephens:

Something has to be done.  I (we) cannot keep working like this.  Again, when the district associates are pulled from our jobs, we come back to a mess.  I came in this morning and last weeks time had not been touched.  I understand that after 4 PM on Friday, (end of the payperiod [sic]) someone realized it needed to be keyed in.  Joe can't be expected to do it, because I can't do the time and all the district work myself.  I am sure that the time was not mentioned to him, or I would have heard from him.  He has not done any time since all the changes have taken place.

You just sent me an e-mail week last week, emphasizing the importance of the time.  I told you that when our job duties are changed, and it is stressed the priority of these duties assigned, the importance is changed.  Well, again, as usual, the time for last week is laying here, undone.  I have been told numerous times this is going to stop.  When one of us is pulled out of the district and the others left have their own duties to do, they do not have time to do someone else's duties.  Now days, associates are "afraid" to do anything other than what they are told.  Then when you do exactly what you are told, you still get chewed.  And again, the priority lies in the core WST, to make sure all of their work it [sic] done, and our work is left to be shifted somewhere, after-the-fact.  There is no way I can run the reports to verify anything.  When the time is keyed in the payperiod [sic] after, the accuracy has been lost, due to time restraints.  I know that none of us would be here if we were not needed.  I have other duties, other than time, that no one seems to care about, and I couldn't begin to write down.  I have been the primary clerk in Milton for many years and different employees expect me to know what I am doing and expect me to keep certain things going, I can no longer do my job effectively and efficiently.  Also, I understand that the supervisors over the WST are not accountable for the line side, and that is where the main responsibility lies in the district offices, and that doesn't seem to be a concern.  I feel that my supervision is taking away my dependability.  I cannot assure anyone that I can do anything anymore.  I have things that I have been trying to do for quite sometime, that I don't feel that I should have to call and ask if I can do.  Because, I know if I stop doing what I am told, then there will be

_____

[6]In her deposition, Jackson acknowledged that she authored this e-mail.  (Mot. Summ. J. Ex. A at 144-45.)

some type of retribution.  I am telling you again, I cannot keep working like this and I am sure others feel the same way.

Again, I have stressed that I am not interested in working in Charleston.  I would like to know if this arrangement is a "condition of employment", since we were told that we would not have to do this, but on a rare occasion and now it has became an indefinite situation.

And, again, I want to talk to Larry Jackson immediately, or should I contact him myself?

I am not trying to cause undue trouble, I am just standing up for what is right and fair.

(Mot. Summ. J. Ex. K.)[7]

According to the affidavit of Stephens, AEP underwent further restructuring in the late Spring of 2002, and a decision was made to reduce the number of staff on the WST.  As a result, Stephens and Mr. Hudson were instructed to complete candidate rating forms and to lay off the two lowest ranking employees out of the four in the Huntington and Milton offices.

On April 26, 2002, Stephens and Mr. Hudson completed a candidate rating form for Jackson.  They rated her as "meets minimum" in the following categories: education, related experience, specific training, job skills, client focus, communication, creativity/continuous improvement and understanding the business and competition.  They rated her as "does not meet" in the categories of job performance, adaptability/flexibility, initiative, planning & organizing and teamwork/collaboration.  (Mot. Summ. J. Ex. L.)  With regard to her job performance rating, they commented as follows: "As our Team goals and objectives evolved there came a need to expand and or change duties and physical reporting work locations as well

---

[7]In her deposition, Jackson acknowledged that she authored the April 29, 2002 e-mail. (Mot. Summ. J. Ex. A at 146-47.)

as in the very way in which we conduct business.  As this required her to report to Charleston on a rotating basis her work performance became less then desirable." *Id.*  With regard to her adaptability/flexibility rating, they commented as follows: "Not adaptable to the ongoing changes in our processes and organization.  She has been openly opposed and forthright in this matter and continues to be so despite of the fact that management has informed her of our reasons and rationale for the evolution of our Team." *Id.*  With regard to her creativity/continuous improvement rating, they commented: "Has submitted 1 idea about going to E-mail time sheets instead of faxing before we considered going to People Soft." *Id.*  With regard to her initiative rating, they commented: "Works in her own environment and pace but she does not seek to go beyond those boundaries.  Does not demonstrate a sense of urgency in her work." *Id.*  With regard to her planing & organizing rating, they commented: "As in performance category her effectiveness in this area has been gradually diminishing despite management efforts to reconcile by informing her of our reason and rationale for our initiatives." *Id.*  With regard to her teamwork/collaboration, they commented: "Her open negativity and defiance to change has detracted from our teams morale and tempo.  Seems content to work in the Milton area of responsibilities and does not contribute as such to the bigger picture of our teams goals and objectives.  Not a team player." *Id.*

In his affidavit, Stephens states that Jackson received one of the two lowest scores and her "low score was due in part to the fact that she openly and continually refused to accept the fact that her reporting location had changed from Milton, West Virginia to Charleston, West Virginia."  (Mot. Summ. J. Ex. B ¶ 14-15.)  On May 3, 2002, Jackson's employment with AEP was terminated.

On July 25, 2002, Jackson sent the following letter to Gene Jenson, Vice-President of

AEP:

As you are aware, I called your hotline number on April 5, 2002, at 3:00 P.M. You returned my call and left me a message on April 9, 2002, at 4:20 PM. You stated that you wanted to talk to me and find out what was going on and try to get me some help. You asked me to call you the next day around 11:00 AM. I called your office and talked to you personally at 11:10 AM on April 10, 2002. I informed you what was going on in our work group. That after I filed my grievance that Mike Stephens was retaliating against me. Your reply was that you was [sic] told it was a misunderstanding about our reporting headquarters and I informed you that Jim Perry had talked to all of the outlying clerks and no one was told about changing our headquarters. I told you it started when Joe Anderson was threatened by Mike Stephens about driving a company vehicle on company time to work in Charleston and Mike told him that he was to drive his own vehicle and if he had a problem with that, then he would just change our reporting headquarters to Charleston and we would have to drive our own vehicle. So Joe reported to John Skidmore, HR, that he felt threatened and harassed and he felt there would be some sort of retaliation. I had been in training that day and the day prior to that, so I e-mailed Mike Stephens asking if something had changed and if I was not to take a company vehicle and he told me that he had made the business decision for our group not to provide transportation any longer. I then filed a grievance, based on being a company policy. It is in the company handbook, contract, and management handbook. So, then all of the sudden Mike and Debbie Tygrett got together and all of our reporting headquarters was Virginia St., Charleston. After talking with Jim Perry he found this not to be true, and no one had been told this. So as of February 26, 2002, Mike Stephens changed our reporting headquarters to Charleston to keep from having charges brought against him and paying mileage. So then he started retaliating and I advised you of this. I also told you of Cheryl Chapman's misconduct and John Hudson being Mike Stephen's [sic] yes-sir man. You asked my opinion of each of these three people and I told you. You asked what you would be told if you were to question the other clerks and I told you, that you would be told that same thing that I am telling you. I also informed you that Mike Stephens said in my grievance meeting and in all the meetings with the other district clerks (Jim Perry and John Skidmore present) that it would be very rate that we have to come to Charleston to work and he was not doing this to mess with us. It was not two weeks later and he put us on a indefinite rotation in Charleston. You ask me what work that I was doing in Charleston could be done from Milton and I told you that any work up there could be done from anywhere, it could be done from Japan. It could be done more efficiently and effectively in the local offices. Why should I drive from Milton to Charleston to fax orders back to the Milton servicers that are standing beside my desk at my fax machine. Makes no sense. But, I told you

Mike Stephens was out for Mike Stephens and he did not care what he did or what he had to do to make himself look good. You told me that you were going to set a "couple of traps" for Mike Stephens and was going to talk to other clerks and get back to me. You told me that you would keep this confidential. Well, that was the end of that.

I trusted you, even though I had been told that you and Mike Stephens were "big buddies." I thought you truly valued your job and your reputation with AEP. Especially in your position. But, I have found that if there is something going wrong, you can't be trusted. I feel that you went to Mike Stephens and set a "couple of traps" for me. That's unethical either way? However, everything that Mike Stephens and John Hudson tried to "tear" me for, I always had myself covered. They set themselves up with what there [sic] were doing, so I couldn't be fired. So, your buddy system, pulled the ole "restructuring" card, and even if there was restructuring going on, employees are not notified and told get their personal belongings and leave within a ten minute period of time, then someone else told to fill their job for the next day. We all know that there was no restructuring going on, that was just a way to get rid of a "whistle-blower." I had insisted on talking to Larry Jackson on two different occasions and I was told to pack up and get out before I could do so. You were aware, so you are responsible for the actions that were made against me on May 3, 2002. I was treated like a criminal. I do not appreciate it and I personally do not think AEP's customers or shareholders would approve either. I do know that the employees do not care for your management style. I know that you wanted to keep this quiet and on a local level. But, you, Mike Stephens, John Hudson, and Cheryl Chapman have mess with me, my livelihood, and most of all, my children.

If a person in your position cannot stand behind his word, then you might consider a career move.

(Mot. Summ. J. Ex. M.)[8]

According to her affidavit, Jackson states that no one told her that her reporting

headquarters had changed from Milton to Charleston prior to February 1, 2002, that no one told

her that her performance was unsatisfactory or needed to improve between February 1, 2002 and

May 3, 2002, that she never refused to report to Charleston between February 26, 2002 and May

---

[8]In her deposition, Jackson appears to acknowledge that she authored the letter. (Mot. Summ. J. Ex. A at 125.)

3, 2002, that she worked twelve days in Charleston between February 26, 2002 and May 2, 2002 and no one complained about her job performance, that the only two questions she asked of management concerning Charleston was the length of time she would be there and who would do her work in her absence, that after the February 26, 2002 meeting she was treated differently by Mr. Hudson and Stephens, that she was expected to do her Milton work when she was in Charleston, that she had to make up her time if her doctor's appointments ran longer than two hours and that because of the harassment and intimidation by Stephens she has been under a doctor's care for emotional distress and has been taking Lexapro and Zanax.  (Response Ex. 1.)

AEP's severance plan provides as follows, in pertinent part:

### American Electric Power Company, Inc.

### SEVERANCE PLAN

The Severance Plan ("Plan") set forth below has been established by American Electric Power Company, Inc. To provide severance benefits to employees whose employment with a Covered Employer is terminated as a direct result of the restructuring, consolidation and/or downsizing of an AEP System Company.

### Eligibility

1.0     An employee of a Covered Employer will be eligible for the benefits set forth in this Plan if the employee meets all of the following requirements and is not subject to any of the exclusions set forth in Section 2.

1.1     The employee is a full-time employee employed by a Covered Employer.

1.2     The employee's employment is terminated as a direct result of the restructuring, consolidation and/or downsizing of the Covered Employer (a "Triggering Event").

1.3     The employee remains employed with the Covered Employer up to and including the date (an "Employment Termination Date") established by the Covered Employer for the employee's

termination pursuant to the Triggering Event.

1.4     The employee timely signs and returns the Severance and Release
        of All Claims Agreement.  (See Section 5.0).

**Exclusions**

2.0     An employee will receive no benefits under this Plan if:

2.1     The employee continues employment with any AEP System Company; or

2.2     The employee declines an offer of employment with any AEP System
        Company at the same or higher salary/rate of pay which, as determined by
        the Administrator, does not require relocation of the employee's primary
        residence.

. . . .

**<u>Miscellaneous Provisions</u>**

. . . .

5.0     An employee shall not be eligible for benefits under this Plan if the
        employee fails to sign and return the Severance and Release of All Claims
        Agreement within 45 days after it is presented to him/her for
        consideration, unless the period for consideration is extended in writing by
        the Administrator.

6.0     The Administrator in its sole discretion may at any time amend this Plan
        for any reason.  Any amendment may be retroactive if deemed necessary
        and appropriate by the Administrator.  The Administrator in its sole
        discretion may discontinue or terminate this Plan or specific benefits
        provided by this Plan at any time and for any reason.

**Definitions**

. . .

7.6     "Severance and Release of All Claims Agreement" shall mean the
        Severance and Release of All Claims Agreement in a form acceptable to
        the Plan Administrator, whereby the employee agrees to waive and release
        the Company, American Electric Power Company, Inc., all AEP System
        Companies and all officers, directors, employees, agents and
        representatives of the Company of and from any and all claims.

. . .

## Administration

8.0    The Plan Administrator shall have all power necessary to enable it to carry out its duties as provided herein.  Not in limitation, but in amplification of the foregoing, the Plan Administrator shall have complete power and discretion to interpret and construe the Plan and its terms and final authority to determine all questions that may arise hereunder as to the entitlement to benefits, eligibility status and rights of the employees and any dependent of any employee affected by this Plan.

## Claims Procedure

9.0    Any employee who has any dispute concerning benefits under this Plan (including any dispute as to the type or computation of benefits) may submit a written claim for the benefit to the Director - H.R. Operations, 40 Franklin Road S.W., P.O. Box 2021 , Roanoke, Virginia 24022, within sixty (60) days of the date that his/her claim arises.

(Mot. Summ. J. Ex O.)

The following is the severance and release of all claims agreement that was tendered to

Jackson on May 31, 2002.  The release was signed by AEP's Stephen L. Jamison on June 1,

2002.  The release was not signed by Jackson.

## American Electric Power Company
### SEVERANCE AND RELEASE OF ALL CLAIMS AGREEMENT

1.    This **Severance and Release of All Claims Agreement** ("Agreement") is entered into by and between April D Jackson, herein after referred to, together with his/her heirs, executors, administrators, successors, assigns and personal representatives, as "Employee", and American Electric Power Company, hereinafter referred to, together with all its past, present and future affiliated, parent and/or subsidiary organizations and divisions, and all past, present and future officers, directors, members, employees and agents of each, in both their individual and representative capacities, as the "Company".

2.    **Severance Allowance**.  The Company shall pay Employee the amount of $20100.46 in gross pay with deductions to be made as required by law.

3.    **Continuation of Medical and Dental Insurance.**  Employees (or

their surviving covered dependents) will have the option to continue medical and dental coverage under COBRA, but at the applicable employee/dependent contribution rate for eighteen (18) months, provided, however, that such coverage shall cease at such time as the employee (or surviving covered dependents) becomes eligible for medical coverage either through Medicare or some other public program or through subsequent employment, whichever comes first.

      a)      At the end of the eighteen (18) month period, an eligible participant may elect to continue medical coverage as provided below:

           i)      Employees who are at least age 50 with at least 10 years of service as of the date of termination may extend medical coverage at a cost based on age and years of service as of the date of termination, and may continue such coverage until the employee (or surviving covered dependents) is eligible for medical coverage either through Medicare or some other public program, or through subsequent employment, whichever occurs first.

           ii)     Employees who are eligible for retiree medical, dental and life coverage as of the date of termination, may extend coverage at the retiree contribution rate.

     4.    **Forms, Medical Statements and Eligibility Information.** Employee (or surviving covered dependents) shall complete and return all required forms to the Company and the insurance carriers in order to receive the benefits described in paragraphs 2 and 3 of this Agreement.  Employee (or surviving covered dependents) further agrees that he/she shall promptly notify the Company when an event as described in paragraph 3 of this Agreement has occurred, which terminates Employee's (or surviving covered dependents') eligibility for continued benefit coverage.

     5.    **Consideration.**  Employee acknowledges that the payment and certain other benefits described in this Agreement are payment and benefits to which he/she would not be entitled but for this Agreement.

     6.    **Release and Consent Not to Sue.**  In consideration of the foregoing payment and benefits, Employee hereby releases and forever discharge the Company and all American Electric Power System Companies, including all of its subsidiaries, affiliates, divisions, organizations and related entities of any and all legal and equitable claims and demands of every name, type, act and nature arising or existing by reason of any known or unknown act or inaction whatsoever.  This release includes, but is not limited to, any claims, charges, complaints, actions or suits arising, directly or indirectly, out of Employee's employment with and/or separation of employment from the Company, and includes, but is not limited to claims, charges, complaints, actions or suits which

may be, have, or might have been asserted under Federal, State or Local statutes concerning civil rights; unlawful employment practices or wage and hour requirements; the Worker Adjustment and Retraining Notification Act (WARN ACT); ); [sic] the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1866, as amended; the West Virginia Human Rights Act; the Fair Labor Standards Act, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Rehabilitation Act of 1973, as amended; the Americans With Disabilities Act, as amended; and Executive Order 11246, as amended.  Excluded from this Agreement are any claims which cannot be waived by law, including but not limited to the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission ("EEOC"). Employee is waiving, however, Employee's right to any monetary recovery or relief should the EEOC or any other agency pursue any claims on Employee's behalf.

7.    **No Admission of Liability**.  Employee understands that the Company believes that he/she has no valid claim against it or the Released Companies and that this Agreement is being offered to give Employee a source of income and benefits while he/she attempts to obtain other employment, and to protect the Company and the Released Companies from the expense and disruption of litigation.  The fact this Agreement is offered to the Employee in the first place will not be understood as an indication that the Company believes he/she has been discriminated against or treated unlawfully in any respect.

8.    **Entire Agreement.**  Employee and the Company acknowledge that this Agreement contains the entire agreement and understanding of the parties and that no other representation or agreement of any kind whatsoever has been made to Employee by the Company or by any other person or entity to cause him/her to sign this Agreement.

9.    **Applicable Law and Venue.**  This Agreement shall be governed and interpreted in accordance with the laws of the State of West Virginia and applicable federal law.

10.    **Severability.**  If any provision of this Agreement is determined to be invalid or unenforceable, the Company and Employee agree that such determination shall not affect the other provisions and that all other provisions shall be enforced as if the invalid provision were not a part of this Agreement.

11.    **EMPLOYEE NOTICE: PLEASE READ CAREFULLY BEFORE SIGNING THIS SEVERANCE AND RELEASE OF ALL CLAIMS AGREEMENT.**
YOU HAVE FORTY-FIVE (45) CALENDAR DAYS WITHIN WHICH TO CONSIDER THIS AGREEMENT.  SHOULD YOU SIGN THE AGREEMENT,

YOU HAVE THE RIGHT TO REVOKE IT, IN WRITING, FOR A PERIOD OF
SEVEN (7) CALENDAR DAYS AFTER YOU SIGN IT.  YOU ARE ADVISED
TO CONSULT WITH AN ATTORNEY PRIOR TO SIGNING THIS
AGREEMENT.  YOU MAY HAVE RIGHTS OR CLAIMS ARISING UNDER
THE AGE DISCRIMINATION IN EMPLOYMENT ACT AND/OR OLDER
WORKERS BENEFIT PROTECTION ACT.  YOU MAY HAVE RIGHTS OR
CLAIMS ARISING UNDER THE AGE DISCRIMINATION IN
EMPLOYMENT ACT AND/OR OLDER WORKERS BENEFIT PROTECTION
ACT.[9]  YOU ARE FURTHER ADVISED THAT THE TOLL FREE
TELEPHONE NUMBER OF THE WEST VIRGINIA STATE BAR
ASSOCIATION IS 1-800-642-3617.

      12.   **Conclusion.**  The parties have read the foregoing Severance and
Release of All Claims Agreement and fully understand it.  They now voluntarily
sign this Agreement on the date indicated, signifying their agreement and
willingness to be bound by its terms.

(Mot. Summ. J. Ex. P (emphasis in original and footnote added). )

      The record also contains a affidavit from Stephen Jamison, Director of Human Resource

Operations for AEP.  Mr. Jamison states that AEP's "severance package is not a benefit earned

by the employee" but "a benefit extended by AEP, unilaterally and voluntarily, in exchange for a

full release, that "sections 1.0, 1.4, and 5.0 of the Plan provide that an employee is not eligible

for benefits under the Plan if the employee fails to sign and return the Severance and Release of

Claims Agreement," that "Jackson was presented the Severance and Release of All Claims

Agreement on May 31, 2002," that "Jackson did not sign the severance release and as such did

not receive a severance payment" and that "the Plan Administrator has not extended the period

for consideration."  (Mot. Summ. J. Ex. Q.)

### III.   JURISDICTION

Before the Court can address defendants' motion for summary judgment, it must

--------

[9]This sentence was repeated in the original.

determine the threshold issue of whether it has jurisdiction.  As stated above, the defendants removed the instant action from the Circuit Court of Cabell County, West Virginia under 28 U.S.C. §§ 1441 and 1446, asserting that this Court has jurisdiction over the action pursuant to § 514(a) of ERISA, 29 U.S.C. § 1144(a).[10]

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  The parties here lack diversity, so jurisdiction may only exist by virtue of federal question jurisdiction.  Federal question jurisdiction exists where a claim arises under federal law.  28 U.S.C. § 1331.[11]  Furthermore, pursuant to the well-pleaded complaint rule, "a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law."  *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).  Moreover, federal issues raised as defenses normally cannot provide a basis for jurisdiction in an action removed from state court.  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987).  The Supreme Court has fashioned, however, the following exception to the well-pleaded complaint

---

[10]Section 514, in full, provides that:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter II of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a).

[11]"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. 1331.

rule: "cause of action within the scope of the civil enforcement provisions of § 502(a)[12] [of ERISA are] removable to federal court" although they "purport[]to raise only state law claims." *Metropolitan Life*, 481 U.S. at 66-67.  Therefore, in order to resolve the issue of the Court's jurisdiction here, two inquires must be made.  The first inquiry is whether plaintiff's complaint raises a federal issue.  If it does, then federal jurisdiction is clear and removal was proper.  If plaintiff's complaint does not raise a federal issue, then the second inquiry is whether removal was proper under § 502(a), the civil enforcement provision of ERISA, codified at 29 U.S.C. § 1132(a).

As stated above, plaintiff has plead two state law claims.  Thus, the complaint does not raise an ERISA claim on its face.  Proceeding to the second inquiry, the Court must determine whether removal was proper under § 502(a).

It is important to recognize that the jurisdictional doctrine of complete preemption differs from the federal defense of ERISA preemption.[13]  Only the

---

[12]Section 502(a) of ERISA provides, in relevant part:

A civil action may be brought-
(1) by a participant or beneficiary-
. . .
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the plan. . . .

29 U.S.C. § 1132(a)(1)(B).

[13]In recent years, federal courts have begun to recognize and explore the contrast between complete preemption [(§ 502(a))] and ERISA preemption [(§ 514(a))].  *See, e.g., Jass*[ v. *Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1487 (7th Cir. 1996) (explaining the differences between complete preemption and ERISA preemption); *Warner v. Ford Motor Co.*, 46 F.3d 531, 535 (6th Cir. 1995) (finding that "[r]emoval and preemption are two distinct concepts"); *Rice v. Panchal*, 65 F.3d 637, 640 (7th Cir. 1995) ("The difference in language between §§ 502(a) and 514(a) underscores the significant difference in the scope of the two

former, not the latter, is a basis for removal.  The ERISA preemption defense stems from the ERISA preemption clause, § 514, which provides that, with only a few exceptions, ERISA's provisions 'supersede any and all State common laws insofar as they may now or hereafter relate to any employee benefit plan.' Although the ERISA preemption clause has been broadly construed, the fact that a plaintiff's state claims may be preempted because they 'relate to' an ERISA plan under § 514 does not necessarily mean that they also fit within the scope of ERISA's civil enforcement provision, § 502.  Put another way, every state claim completely preempted by § 502 is, a fortiori, related to ERISA, but not every state claim related to ERISA under § 514 is completely preempted.[14]  In other words, because § 502 is narrower than § 514, complete preemption, which turns on the scope of § 502, is narrower than § 514 preemption.  In the final analysis, then, 'when the doctrine of complete preemption does not apply, but the plaintiff's state claim is arguably preempted under § 514(a), the district court, being without removal jurisdiction, cannot resolve the dispute regarding [ERISA] preemption.'[15] This task falls to the state court on remand.

*Lancaster v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.*, 958 F. Supp. 1137, 1144 (E.D.Va. 1997) (parallel citations and footnotes omitted).  *See also Metropolitan Life*, 481 U.S. at 66; *Romney v. Lin*, 94 F.3d 74, 80 (2nd Cir. 1996); *Dukes*, 57 F.3d at 355 (3rd Cir.); *Lister v. Stark*, 890 F.2d 941, 943 & n. 1 (7th Cir. 1989); *Lancaster v. Kaiser Found. Health Plan*, 958 F. Supp. 1137, 1144 & n. 21 (E.D.Va. 1997)"); and, *Warren v. Blue Cross and Blue Shield of South Carolina*, 129 F.3d 118, 1997 WL 701413 at **2 (4th Cir. Nov. 12, 1997) (unpublished) (holding that "[o]nly state law claims preempted by § 502(a) provide a basis for removal jurisdiction).  Therefore, jurisdiction only exists in this case if the Court is able to properly

---

sections."); *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 272-73 (2nd Cir. 1994) (reversing a district court's dismissal of plaintiff's state law professional malpractice claim on the basis of ERISA preemption because the cause of action did not satisfy the complete preemption doctrine).

[14]*Duke v. U.S. Healthcare, Inc.*, 57 F.3d 350, 354 (3rd Cir.) ("That the Supreme Court has recognized a limited exception to the well-pleaded complaint rule for state law claims which fit within the scope of § 502 by no means implies that all claims preempted by [§ 514] of ERISA are subject to removal."), *cert. denied*, 116 S. Ct. 564 (1995).

[15]*Id.* at 355.

recharacterize plaintiff's suit as a civil action brought pursuant to § 502(a) to enforce rights guaranteed by ERISA.  *Metropolitan Life*, 481 U.S. at 66-67.

In *Butero v. Royal MacCaabees Life Ins. Co.*, 174 F.3d 1207 (11th Cir. 1999), the appeals court outlined four elements needed for a claim to fall within § 502(a)'s scope.

> First, there must be a relevant ERISA plan. [*Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1330 (11th Cir. 1998)]; *Kemp v. International Business Machs. Corp.*, 109 F.3d 708, 713 (11th Cir. 1997).  Second, the plaintiff must have standing to sue under that plan.  *See Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1350 n.3 (11th Cir. 1998).  Third, the defendant must be an ERISA entity.  See id.; *Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024, 1029 (11th Cir. 1997); *see also Morstein v. National Ins. Servs., Inc.*, 93 f.3d 715, 722 (11th Cir. 1996) (en banc) (no preemption at all–not even defensive preemption– when the defendant is 'a non-ERISA entity' and the claims do not 'affect relations among principal ERISA entities as such').  Finally, the complaint must seek compensatory relief akin to that available under § 1132(a); often this will be a claim for benefits due under a plan.  *See Engelhardt*, 139 F.3d at 1354; *Franklin*, 127 F.3d at 1029.

*Butero*, 174 F.3d at 1212.  ERISA entities are "the principals, the employer, the plan, the plan fiduciaries and the beneficiaries."  *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1469 (4th Cir. 1996) (quoting *Custer v. Sweeney*, 89 F.3d 1156, 1167 (4th Cir. 1996) *See also Morestein v. National Ins. Ser., Inc.*, 93 F.3d 715, 722 (11th Cir. 1996) (holding "when a state law claim brought against a non-ERISA entity does not affect relations among principal ERISA entities as such, then it is not preempted by ERISA"); *Hospice of Metro Denver, Inc. v. Group Health Ins. of Okla. Inc.*, 944 F.2d 752, 756 (10th Cir. 1991) (holding that ERISA has no bearing on state law claims which do not affect the relations among the principal ERISA entities, the employer, the plan, the plan fiduciaries and the beneficiaries); *Airparts Co. v. Custom Benefits Services of Austin*, 28 F.3d 1062 (10th Cir. 1994) (holding actions that affect the relations between one or more of the ERISA entities and an outside party escape preemption); and, *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 249 (5th Cir. 1990).  Finally, "[a] plan established by

an employer for severance pay benefits is an employee welfare benefit plan covered by ERISA."

*Biggers v. Wittek Industries, Inc.*, 4 F.3d 291, 295 (4th Cir. 1993).

In the case *sub judice*, the plaintiff seeks in her prayer for relief severance pay.  Given

this claim for relief, the Court holds in accordance with the holdings in *Metropolitan Life*,

*Biggers*, *Selman* and  *Butero* that plaintiff's complaint can be recharacterized as seeking to

enforce her rights pursuant to § 502(a) because AEP's severance plan is an employee welfare

benefit plan, because as a beneficiary plaintiff has standing to sue under the plan, because AEP is

an ERISA entity and because plaintiff seeks benefits under the plan.  Accordingly, the Court

further holds that it has federal question jurisdiction over the instant action pursuant to the civil

enforcement provisions of § 502(a) of ERISA, 29 U.S.C. § 1132(a)(1)(b), not § 514, 29 U.S.C. §

1144(a).

With regard to plaintiff's state law claims for retaliatory discharge and intentional

infliction of emotional distress, the Court holds that it has jurisdiction over these claims pursuant

to 28 U.S.C. § 1367.

## IV.    STANDARD FOR SUMMARY JUDGMENT

As stated above, the defendants have moved for summary judgment against the plaintiff.

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which

provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2005).  Moreover, the rule also provides, in relevant part, as follows:

When a motion for summary judgment is made and supported as provided in this

> rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e) (2005).  In discussing this standard, the U.S. Supreme Court stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[I]n assessing a motion for summary judgment all justifiable inferences must be drawn in favor of the nonmoving party for '[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts.'" *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Hence, "[t]he court 'must perform a dual inquiry into the genuineness and materiality of any purported factual issues.'"  999 F.2d at 778 (quoting *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985)).

The substantive law identifies facts that are material.  Consequently, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgement.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  *Ross*, 759 F.2d at 364.

Page 28 of  45

Therefore, in reviewing the evidence, a judge must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  If no genuine issue of material fact exists, the Court has an obligation "to prevent 'factually unsupported claims and defenses' from proceeding to trial."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323-24).

Finally, when a party's "state of mind" is a decisive element of a claim or defense, summary judgment is seldom appropriate because "state of mind" determinations usually depend on the credibility of witnesses or the resolution of conflicting inferences drawn from circumstantial or self-serving evidence.  *Thacker v. Peak*, 800 F. Supp. 372, 376 (S.D.W.Va. 1992) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) and *Ross*, 759 F.2d at 364)).  Nevertheless, even if motive is material, summary judgment is not precluded if the claim rests solely on unsupported allegations.  *Id.* (citing *Ross*, 759 F.2d at 365).

## V.   ANALYSIS

The defendants assert that they are entitled to summary judgment for the following reasons: (1) Plaintiff has failed to identify a substantial public policy upon which to base her retaliatory discharge claim.  (2) Assuming, arguendo, that plaintiff has identified a substantial public policy of the State of West Virginia, she cannot sustain a claim for retaliatory discharge. (3) Plaintiff cannot sustain a claim for intentional infliction of emotional distress.  The plaintiff, on the other hand, argues that filing a grievance in exercise of her constitutional right was the motivating factor for her discharge, that the issue of whether she was discharged for filing the

grievance is a question for the jury, that the defendants have not offered a legitimate non-retaliatory reason for her termination, that she can sustain her claim for emotional distress and that plaintiff may attack the validity of the release and contract not to sue.

### A.    Implied Claim for Severance Pay

Starting with the claim for severance pay, the Fourth Circuit has developed a framework for review of the denial of benefits under ERISA plans.  *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997).  In actions in which a court reviews an administrator or fiduciary's decision to deny benefits, if the benefit plan grants the administrator or fiduciary the discretionary authority to interpret plan terms and participant eligibility, a court may reverse the administrator or fiduciary's decision only upon finding an abuse of discretion.  *See Firestone v. Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999); and, *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996).  "This deferential standard of review requires that a reviewing court not disturb an administrator's decision if it is reasonable, even if this Court would have reached a different conclusion."  *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000) (citing *Bruch*, 489 U.S. at 109-11 and *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996).  Such a decision is considered reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  *Borgan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997) (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995).

In the case *sub judice*, after reviewing paragraph 8.0 of AEP's severance plan, it appears that the plan's administrator had the power to interpret the plan's terms and a participant's eligibility.  Therefore, in accordance with the holdings in *Bruch*, *Elliott* and *Bedrick*, the Court

holds that it may reverse the administrator's decision, here, only upon a finding of abuse of discretion.

Jackson argues that § 6 of the severance and release of all claims agreement tendered to her by AEP is void as a matter of law and that she should be allowed to receive her severance benefits because AEP did not provide if § 6 was voided the severance benefits would be withdrawn. In support of her argument, the plaintiff points to the holdings in *Reighard v. Limbach Co., Inc.*, 158 F. Supp.2d 730 (E.D. Va. 2001) and *Kucera v. City of Wheeling*, 158 W. Va. 860, 215 S.E.2d 216 (1975).

In response, AEP argues the following:

> The plan under which Plaintiff would have been eligible for benefits is the American Electric Power Company, Inc. Severance Plan ("Plan"). The Plan is a welfare benefit plan covered by ERISA. *See Biggers v. Wittek Industries, Inc.*, 4 3d. [sic] 291, 295 (4th Cir. 1993) (stating that "[a] plan established by an employer providing for severance pay benefits is an employee welfare benefit plan covered by ERISA"). "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) (citation omitted). As such, any entitlement to severance benefits alleged by Plaintiff cannot be found in ERISA, but must be found in terms of the Plan itself. In AEP's initial memorandum of law, an extensive analysis is provided as to the validity of AEP's severance release.
>
> In essence, Plaintiff is stating that she should not have to sign a standard release as a condition to receiving a severance package. Plaintiff wants unfettered discretion to take the severance, not sign a release, and bring a lawsuit against AEP. Plaintiff provides no authority for her argument that AEP cannot require a standard release before giving an unearned severance. Plaintiff cites *Reighard v. Limbach Co., Inc.*, 158 F. Supp.2d 730 (E.D. Va. 2001), presumably in support of her position. Again, this case cited by Plaintiff is not on point. In *Reighard*, the plaintiff signed a covenant not to sue in the event that he was involuntarily terminated. The plaintiff was eventually terminated and filed a lawsuit which contained four claims under ERISA, none of which involved severance benefits or welfare benefit plans under ERISA. The employer argued that the plaintiff

could not sue under ERISA because he signed the covenant not to sue.  The *Reighard* court held that a covenant not to sue is not effective as to "unknown, future ERISA claims."  In addition, the court held that "[t]o be sure, an employee may voluntarily waive known ERISA benefits.  Waivers of known ERISA rights - typically obtained in connection with settlements - do not generally serve to invite or encourage future violations."  Clearly, the *Reighard* court's analysis is not applicable to the present case.

(Reply at 12-13.)

In *Reighard*, the plaintiff entered into an employment agreement with the defendants as an employee-at-will.  As such, he could be discharged with or without cause, and his salary under the agreement would cease.  However, the agreement also provided that his benefits under the defendants' insurance plan would only be extinguished in the event he were terminated for cause.  The agreement also included a covenant from the plaintiff not to sue the defendants for any involuntary termination.  The defendants terminated the plaintiff, and he filed a complaint against the defendants, asserting four claims under ERISA.  The defendants filed a counterclaim contending that plaintiff breached his covenant not to sue for any involuntary termination.

The *Reighard* court held as follows:

The threshold issue in the analysis of this question is the choice of governing law.  Clearly, federal law must govern resolution of this question.  This follows from the expansive, indeed "unparalleled breadth," of ERISA's preemption provisions.  *Holland v. Burlington Indus., Inc.*, 772 F.2d 1140, 1147 (4th Cir. 1985).  By its terms, ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  The Supreme Court has held that, generally, "a law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).  Because PBM's counterclaim asserts that plaintiff's covenant is a waiver of all future ERISA claims under the Plan, it quite clearly "relates to" or has a "connection with" an ERISA employment benefit plan.  Moreover, the covenant, if literally applied, would grant defendant its attorneys' fees whether or not plaintiff prevails on his ERISA claims under the Plan.  Thus, the covenant not only "relates to" an ERISA plan, it also operates to contradict the statute's attorneys' fees scheme.  Accordingly, federal law governs

here by preemption.

Federal authority is sparse on the question of whether ERISA rights or claims may be waived prospectively.  Although there is no Fourth Circuit authority directly on point, the Tenth Circuit, in *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1293 (10th Cir. 1991), has squarely held that a covenant not to sue and a release signed by an employee is not effective as to unknown, future ERISA claims.  *See also McLendon v. Continental Group, Inc.*, 602 F. Supp. 1492, 1505 (D.N.J. 1985) (acknowledge that rights under Section 510 of ERISA may not be waived prospectively).  This result is based on the sensible proposition -well- recognized in cases considering the validity of waivers of future statutory rights - that such waivers, if allowed, would have the pernicious effect of tending to encourage violations by assuring the wrongdoers that they may act with impunity.  To be sure, an employee may voluntarily waive known ERISA benefits.  Waivers of known ERISA rights - typically obtained in connection with settlements - do not generally serve to invite or encourage future violations.  By contrast, where, as here, a covenant not to sue purports to waive prospectively any future rights or claims under ERISA, the result, in effect, is to grant the employer a license to violate ERISA in the future with impunity.  ERISA rights are too important to permit this result.

158 F. Supp.2d at 731-33 (footnotes omitted).

With regard to the holding in *Kucera*, § 514 of ERISA preempts any and all State laws.

Consequently, *Kucera's* holdings is inapplicable to the case at bar.

Contrary to Jackson's assertion, the severance and release of all claims agreement at issue in the instant action does not seek to prospectively waive any claims Jackson may have in the future for future wrongs committed by AEP.  Instead, the agreement states that in consideration of the severance pay Jackson releases AEP from any and all claims, which can be waived legally, arising, directly or indirectly, out of her employment with and/or separation of employment from AEP.  (Mot. Summ. J. Ex. P § 6.)  Thus, the agreement is actually a settlement offer, and as such is not void as a matter of law.  *See United Mine Workers v. New River Co.*, 842 F.2d 734, 737 (4th Cir. 1988) (recognizing that an employee may voluntarily waive his known ERISA benefits).  Finally, contrary to Jackson's assertion, § 6 does not prevent her from

asserting any ERISA rights in the future because § 6 does not mention ERISA.  Based on the foregoing, the Court holds that § 6 is not void as a matter of law.

Turning to AEP's decision not to extend the severance benefits to Jackson, it appears from the evidence before the Court that AEP's severance benefit was not a vested benefit, and Jackson has not brought forth any evidence indicating that she had a vested interest in it.  Thus, the forfeiture of such does not violate 29 U.S.C. § 1053(a).  *See also Sutton v. Weirton Division of National Steel Corp.*, 724 F.2d 406, 410 (4th Cir. 1983) (holding that "accrued benefits secured by ERISA do not encompass unfunded, contingent early retirement benefits or severance payments."

29 U.S.C. § 1104(a)(1)(D) provides that an ERISA benefits plan administrator must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with the documents and instruments governing the plan . . ." Sections 1.4 and 5.0 of AEP's severance plan clearly provide that an employee is not eligible for severance benefits under the plan if the employee fails to sign and return the severance and release of all claims agreement within forty-five days.  In her deposition, Jackson admitted that she had not signed the severance and release of claims agreement.  (Mot. Summ. J. Ex. A at 113-14.)  Moreover, AEP's severance plan administrator, Stephen Jamison, stated in an affidavit that Jackson was not entitled to a severance benefit until and unless she signed the severance and release of all claims agreement, that she failed to sign the severance and release of all claims agreement and that he had not extended the forty-five day period for consideration.  (Mot. Summ. J. Ex. Q.)  Given the clear language in AEP's severance plan regarding eligibility for the severance benefit, and as Jackson has admitted to not signing the severance and release of all

claims agreement, the Court holds in accordance with 29 U.S.C. § 1104(a)(1)(D) that AEP's

severance plan administrator's decision not to extend severance benefits to Jackson was the

result of a deliberate, principled reasoning process and is supported by substantial evidence.

Accordingly, the Court grants defendants' motion for summary judgment regarding plaintiff's

claim for severance benefits.

### B.    Retaliatory Discharge Claim

Turning to the retaliatory discharge claim, the Supreme Court of Appeals of West

Virginia has provided the following guidance on this issue in *Feliciano v. 7-Eleven, Inc.*, 210

W.Va 740, 559 S.E.2d 713 (2001):

> In the State of West Virginia, employers and employees alike are generally
> governed by the at will employment doctrine.[16]  Pursuant to this body of law,
> "[w]hen a contract of employment is of indefinite duration it may be terminated at
> any time by either party to the contract." Syl. pt. 2, *Wright v. Standard
> Ultramarine & Color Co.*, 141 W.Va. 368, 90 S.E.2d 459 (1955).  The practical
> effect of this doctrine, then, is that "an at-will employee serves at the will and
> pleasure of his or her employer and can be discharged at any time, with or without
> cause."  *Kanagy v. Fiesta Salons, Inc.*, 208 W.Va. 526, 529, 541 S.E.2d 616, 619
> (2000) (citation omitted).  Nevertheless, "'the employer is not so absolute a
> sovereign of the job that there are not limits to his prerogative.'" *Id.*, 208 W.Va. at
> 533, 541 S.E.2d at 623 (quoting *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167,
> 178, 164 Cal. Rptr. 839, 845, 610 P.2d 1330, 1336 (1980)).
>
> > The rule that an employer has an absolute right to discharge
> > an at will employee must be tempered by the principle that where
> > the employer's motivation for the discharge is to contravene some
> > substantial public policy princip[le], then the employer may be

---

[16]It goes without saying, however, that where an employment contract specifically
addresses the term or duration of employment, the employment most likely is not at will. *Cf.* Syl.
pt. 3, *Wright v. Standard Ultramarine & Color Co.*, 141 W.Va. 368, 90 S.E.2d 459 (1955) ("'An
employment upon a monthly or annual salary, if no definite period is otherwise stated or proved
for its continuance, is presumed to be a hiring at will, which either party may at any time
determine at his pleasure without liability for breach of contract.' Point 1, syllabus, *Resener v.
Watts, Ritter and Company*, 73 W.Va. 342[, 80 S.E. 839 (1913)].").

liable to the employee for damages occasioned by this discharge.

Syl., *Harless v. First Nat'l Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978). This exception to the at will employment doctrine recognizes that, in spite of the right of employers to terminate their employees, "'[o]ne of the fundamental rights of an employee is the right not to be the victim of a "retaliatory discharge," that is, a discharge from employment where the employer's motivation for the discharge is in contravention of a substantial public policy[.]'" *Kanagy*, 208 W.Va. at 530, 541 S.E.2d at 620 (quoting *McClung v. Marion County Comm'n*, 178 W.Va. 444, 450, 360 S.E.2d 221, 227 (1987) (quotation and citation omitted)).

Accordingly, a cause of action for wrongful discharge exists when an aggrieved employee can demonstrate that his/her employer acted contrary to substantial public policy in effectuating the termination. "'"[P]ublic policy" is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against public good even though no actual injury may have resulted therefrom in a particular case to the public.'" *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. at 325, 325 S.E.2d at 114 (quoting *Allen v. Commercial Cas. Ins. Co.*, 131 N.J.L. 475, 477-78, 37 A.2d 37, 39 (1944) (internal quotations and citations omitted)). Whether a particular factor motivating a discharge from employment is a matter of public policy is dictated by reference to various authorities: "[t]o identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Syl. pt. 2, *Birthisel v. Tri-Cities Health Servs. Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992). E.g., Syl. pt. 3, *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 135, 506 S.E.2d 578 (1998) (discussing procedure for basing substantial public policy on constitutional provision). However, in order to sustain a cause of action for wrongful discharge, the public policy relied upon must not just exist; it must be substantial. "Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." Syl. pt. 3, *Birthisel*, 188 W.Va. 371, 424 S.E.2d 606. Moreover,

> [t]he term "substantial public policy" implies that the policy principle will be clearly recognized simply because it is substantial. An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations.

*Id.*, 188 W.Va. at 377, 424 S.E.2d at 612. Thus, to be substantial, a public policy must not just be recognizable as such but must be so widely regarded as to be evident to employers and employees alike.

. . .

[A]s guidance for future cases, we find the following elements of the tort of
wrongful discharge, as enumerated by the United States Court of Appeals for the
Sixth Circuit in *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365 (6th Cir. 1999), to
be particularly instructive to a determination of whether an employee has
successfully presented a claim of relief for wrongful discharge in contravention of
substantial public policy:

> 1. [Whether a] clear public policy existed and was manifested in a
> state or federal constitution, statute or administrative regulation, or
> in the common law (the *clarity* element).
> 2. [Whether] dismissing employees under circumstances like those
> involved in the plaintiff's dismissal would jeopardize the public
> policy (the *jeopardy* element).
> 3. [Whether t]he plaintiff's dismissal was motivated by conduct
> related to the public policy (the *causation* element).
> 4. [Whether t]he employer lacked overriding legitimate business
> justification for the dismissal (the *overriding justification* element).

173 F.3d at 375 (quoting *Kulch v. Structural Fibers, Inc.*, 78 Ohio St3d 134, 151,
677 N.E.2d 308, 321 (1997) (internal quotations and citations omitted)).  This
succinct summation merely reiterates the procedures we previously have
delineated in the foregoing discussion and decision of this case.

*Feliciano*, 210 W.Va. at 744-45, 750, 559 S.E.2d at 717-18, 723 (footnote in original).  Finally,

the Court notes that "[a] determination of the existence of public policy in West Virginia is a

question of law, rather than a question of fact for a jury."  Syl. Pt. 1, *Cordle v. General Hugh

Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984).

Since the *Harless* ruling, the Supreme Court of Appeals of West Virginia has identified

specific instances of what qualifies as substantial public policy.  *See*, *e.g.*, *Wounaris v. West

Virginia State College*, 214 W.Va. 241, 588 S.E.2d 406 (2003) (finding substantial public policy

violation when an at-will state employee was discharged while pursuing a grievance under *W.Va.

Code* § 18-29-1); Syl. Pt. 8, *Feliciano v. 7-Eleven, Inc.*, 210 W.Va. 740, 559 S.E.2d 713 (2001)

(holding that "[w]hen an at will employee has been discharged from his/her employment based upon his/her exercise of self-defense in response to lethal imminent danger, such right of self-defense constitutes a substantial public policy exception to the at will employment doctrine and will sustain a cause of action for wrongful discharge"); Syl. Pt. 5, *Kanagy v. Fiesta Salons, Inc.*, 208 W.Va. 526, 541 S.E.2d 616 (2000) (holding West Virginia Code of State Regulations § 3-5-3 clearly provides a substantial public policy sufficient to support a claim for wrongful discharge where an employee is discharged in retaliation for providing truthful information, in compliance with the requirements of the regulations, to an investigator for the West Virginia Board of Barbers and Cosmetologists); Syl. Pt. 5, *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997) (holding that substantial public policy arises under West Virginia Code of State Regulations § 64-12-14.2.4 (1987), which sets forth the requirements for staffing a hospital unit); Syl. Pt. 8, *Williamson v. O. Greene*, 200 W.Va. 421, 490 S.E.2d 23 (1997) (holding that "[e]ven though a discharged at-will employee has no statutory claim for retaliatory discharge under *W.Va. Code*, 5-11-9(7)(C) [1992] of the West Virginia Human Rights Act because his or her former employer was not employing twelve or more persons within the state at the time the acts giving rise to the alleged unlawful discrimination practice were committed, as required by *W.Va. Code*, 5-11-3(d) [1994], the discharge employee may nevertheless maintain a common law claim for retaliatory discharge against the employer based on alleged sex discrimination or sexual harassment because sex discrimination and sexual harassment in employment contravene the public policy of this State articulated in the West Virginia Human Rights Act, *W.Va. Code*, 5-11-1, *et seq.*"); Syl. Pt. 4, *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996) (finding substantial public policy

violation when at-will employee was discharged based on concern that employee has given or may be called to give truthful testimony in a legal action); Syl. Pt. 4, *Roberts v. Adkins*, 191 W.Va. 215, 444 S.E.2d 725 (1994) (holding that a cause of action for wrongful discharge may exist under *W.Va. Code* § 21-5-5, which sets forth criminal liability for employers who coerce employees to purchase goods in lieu of wages); *Slack v. Kanawha County Hous. & Redevelopment Auth.*, 188 W.Va. 144, 423 S.E.2d 547 (1992) (finding generally that substantial public policy implicated where employee brings attention of federal prosecutors to improprieties in operation of housing authority); Syl. Pt. 2, *Lilly v. Overnight Transp. Co.*, 188 W.Va. 538, 425 S.E.2d 214 (1992) (holding that substantial public policy is predicated upon *W.Va. Code* § 17C-15-1(a), § 17C-15-31 and § 24A-5-5(j), relating to operation of motor vehicle with brakes in unsafe working condition); *Mace v. Charleston Area Med. Center Foundation, Inc.*, 188 W.Va. 57, 422 S.E.2d 624 (1992) (holding that an employee stated a cause of action for wrongful discharge where the employer discharged him in retaliation for exercising rights under the Veterans Reemployment Rights Act); Syl. Pt. 2, *Collins v. Elkay Mining Co.*, 179 W.Va. 549, 371 S.E.2d 46 (1988) (holding that substantial public policy arises from *W.Va. Code* § 22A-1A-20); Syl. Pt. 2, *McClung v. Marion County Comm'n*, 178 W.Va. 444, 360 S.E.2d 221 (1987) (holding that substantial public policy is grounded in Wage and Hour Act, *W.Va. Code* § 21-5C-8); *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984) (holding that an employee's discharge for refusing to take a polygraph test gave rise to a cause of action for retaliatory discharge); Syl. Pt. 2, *Shanholtz v. Monongahela Power Co.*, 165 W.Va. 305, 270 S.E.2d 178 (1980) (holding that substantial public policy arises from Workers' Compensation Act, *W.Va. Code* § 23-5A-1); and, *Hurley v. Allied Chemical Corp.*, 164 W.Va. 268, 262 S.E.2d

757 (1980) (holding that employee who was denied employment on the sole basis that he received treatment for mental illness, mental retardation or addiction was found to state a cause of action for wrongful discharge because the employer's conduct violated W.Va. Code 27-5-9(a)).

*But see*, Syl. Pt. 4, *Tiernan v. Charleston Area Med. Center, Inc.*, 203 W.Va. 135, 506 S.E.2d 578 (1998) (holding that an employee did not have a public policy wrongful discharge cause of action against a private employer emanating from the free speech clause of the state constitution); *Birthisel v. Tri-Cities Health Ser. Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992) (holding that the hospital's discharge of worker did not violate public policy by forcing worker to violate ethics standards); and, *Tritle v. Crown Airways, Inc.*, 928 F.2d 81 (4th Cir. 1990) (refusing to recognize a cause of action for retaliatory discharge based on public policy because the West Virginia Supreme Court had not yet addressed the question of whether W.Va. Code 29-2A-12 and 29-2A-20 supported such a cause of action).

In the case *sub judice*, Jackson argues that her filing a grievance is protected by Article III of the West Virginia Constitution.  In support of her argument, Jackson points to the holdings in *McClung*, *supra*, *Wounaris*, *supra*, and *Tiernam, supra*.

AEP, on the other hand, argues that Jackson has failed to identify a substantial public policy upon which to baser her retaliatory discharge claim and that the West Virginia Constitution does not protect an employee who files an internal grievance with his or her company.

In *McClung*, a county employee filed suit against the county commission alleging violation of the state's overtime statute, denial of due process and retaliatory discharge.  The

court stated:

> The appellee's discharge of the appellant in this case was unlawful if it
> was in violation of the appellant's rights under the Constitution of West Virginia
> to petition for redress of grievances and to have the courts of this State open to
> him for an alleged injury to his person, property or reputation.[17]  In addition to
> these constitutional implications, the statutory law of this State on minimum
> wages and maximum hours recognizes the public policy of protecting an
> employee against discharge or discrimination by the employer in retaliation for
> the employee's pursuing his or her civil remedies to obtain wages in accordance
> with the state minimum wage and maximum hour laws.[18]
>
> Case law also provides this protection.  . . .  Stated succinctly, "[o]ur
> responsibility is to ensure that citizens are not deprived of fundamental rights by
> virtue of working for the government; . . ."  *Connick v. Myers*, 461 U.S. 138, 147,
> 103 S.Ct. 1684,1690, L.Ed.2d 708, 720 (1983).

178 W.Va. 449-50, 360 S.E.2d at 226-27 (footnotes in original).  Based on the above reasoning,

the court held:

> Certainly it is in contravention of substantial public policies for an employer to
> discharge an employee in retaliation for the employee's exercising his or her state
> constitutional rights to petition for redress of grievances (*W.Va. Const.* Art. III, §
> 16) and to seek access to the courts of this State (*W.Va. Const.* Art. III, § 17) by

---

[17]*W.Va. Const.* Art. III, § 16 provides in pertinent part: "The right of the people . . . to
apply for redress of grievances, shall be held inviolate."  *W.Va. Const.* Art. III, § 17 provides in
pertinent part: "The courts of this State shall be open, and every person, for an injury done to
him, in his person, property or reputation, shall have remedy by due course of law; . . ."

[18]*W.Va. Code*, 21-5C-7(a) [1971] provides:

(a) Any employer who wilfully discharges or in any manner wilfully
discriminates against any employee because such employee has made complaint
to his employer, or to the commissioner, that he has not been paid wages in
accordance with the wage and hour provisions of this article, or because such
employee has instituted or is about to institute any civil action, or file any petition
or criminal complaint against the employer by reason of the provisions of this
article, or because such employee has testified or is about to testify in any
administrative proceeding, civil action, or criminal action under this article, shall
be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less
than one hundred dollars nor more than five hundred dollars.

filing an action, pursuant to *W.Va. Code*, 21-5C-8 [1975], for overtime wages.

178 W.Va. 450, 360 S.E.2d at 227.

In *Wounaris*, an employee of West Virginia State College filed suit against the College

alleging retaliatory discharge after filing two grievances pursuant to *W.Va. Code* § 18-29-1.[19]

The court held:

> We believe that the actions of the College in this case, where an ALJ
> ordered Mr. Wounaris' reinstatement, and in response the College re-hired him
> and then immediately terminated him even before the appeals process had run its
> course, present a clear violations of public policy. Because we have determined
> that an employer, under these circumstances and in the absence of some
> significant, novel reason, cannot terminate an employee in the middle of a
> grievance proceeding, we must reverse the decision of the lower court. To hold
> otherwise would be to make a mockery of the grievance process and leave an
> employee who had won reinstatement with a Pyrrhic victory, at best.

214 W.Va. at 250, 588 S.E.2d at 415.

In *Tiernan*, a former employee, a nurse, brought an action against Charleston Area

Medical Center for retaliatory discharge for writing a letter to the editor of The Charleston

Gazette in which she criticized the hospital's budgetary cutbacks. The Court held:

> Therefore, we hold, that the Free Speech Clause of the state constitution is not
> applicable to a private sector employer. In the absence of a statute expressly

---

[19]*W.Va. Code* § 18-29-1 provides:

The purpose of this article is to provide a procedure for employees of the
governing boards of higher education, state board of education, county boards of
education, regional educational service agencies and multi-county vocational
centers and their employer or agents of the employer to reach solutions to
problems which arise between them within the scope of their respective
employment relationships to the end that good morale may be maintained,
effective job performance may be enhanced and the citizens of the community
may be better served. This procedure is intended to provide a simple, expeditious
and fair process for resolving problems at the lowest possible administrative level
and shall be construed to effectuate this purpose.

>imposing public policy emanating from the state constitutional Free Speech
>clause upon private sector employers, an employee does not have a cause of
>action against a private sector employer who terminates the employee because of
>the exercise of the employee's state constitutional right of free speech.

203 W.Va. at 149, 506 S.E.2d at 591.

Taking the facts in light most favorable to Jackson, it appears that AEP terminated Jackson's employment in retaliation for her filing an internal grievance concerning AEP's travel policy for administrative associates. Thus, the issue, here, is whether discharging an employee for filing an internal company grievance violates a substantial public policy of the State of West Virginia. In order to identify a substantial public policy, the Court is required to look at established precepts in the West Virginia Constitution, West Virginia statutes and West Virginia case law. *See* Syl. Pt. 2, *Birthisel*, 188 W.Va. 371, 424 S.E.2d 606. Contrary to Jackson's assertion, the holding in *Tiernan* indicates that the West Virginia Supreme Court of Appeals has been reluctant in the case of a private employee to find a cause of action for retaliatory discharge based on a public policy emanating from the West Virginia Constitution. Furthermore, unlike Jackson (a private employee), the plaintiffs in *McClung* and *Wounaris* were public employees that had filed grievances pursuant to a state statute. Jackson's grievance, on the other hand, was filed pursuant to AEP's internal company policy. Thus, none of cases cited by Jackson support the proposition that discharging an employee who files an internal company grievance violates a substantial public policy of the State of West Virginia.

Moreover, Article III, § 16 of the West Virginia Constitution protects a citizens right to file a grievance with the government, not an internal private company grievance. Thus, Jackson's assertion that the constitutional right protects her is misguided because she has taken the right and applied it in an alternate context. If Jackson had been discharged for filing a

grievance pursuant to a West Virginia statute, a federal statute or for filing a lawsuit, the Court would have a difficult decision to make.  Those facts, however, are not present here.  In addition, the Court is hard pressed to find how the filing of an internal grievance in a private company will protect the public at large.  AEP's actions, here, if Jackson's allegations are true, indicate nothing more than a truly bad business decision because it has lost a valued employee with over sixteen years of experience.  Finally, the Court notes that the West Virginia Supreme Court rejected "the implied covenant of good faith and fair dealing in the context of an at-will employment contract."  *See Miller v. Massachusetts Mutual Life Ins. Co.*, 193 W.Va. 240, 244, 455 S.E.2d 799, 803 (1995).  As Jackson has failed to bring forth evidence that her discharge violated an established substantial public policy of the State of West Virginia, the Court grants defendants' motion for summary judgment with regard to the first count of the complaint.

### C.    Intentional Infliction of Emotional Distress Claim

Turning to her claim for intentional infliction of emotional distress, Jackson alleges that requiring her to sign the severance and release of all claims agreement as a condition precedent to receiving her severance pay was extreme and outrageous conduct that was against public policy and violated ERISA.

In *Courtney v. Courtney*, 413 S.E.2d 418, 422 (W.Va. 1991), the court set forth the following standard for a cause of action for intentional infliction of emotional distress:

> [A] cause of action will lie for emotional distress, unaccompanied by physical injury, provided four elements are shown:  One, the wrongdoer's conduct was intentional or reckless.  This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result.  Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality.  This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only

bad manners and mere hurt feelings are involved.   Three, there was a causal
connection between the wrongdoer's conduct and the emotional distress.   Four,
the emotional distress was  severe.

(Internal citations and quotation marks omitted.)

As stated above, AEP's offer of severance pay in exchange for a release did not violate
ERISA or any other public policy.  Thus, AEP's conduct of requiring Jackson to sign the release
in order to receive a severance benefit was not so outrageous in character, and so extreme in
degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and
utterly intolerable in a civilized community.  *See Harless*, 169 W.Va. at 693 n.20, 289 S.E.2d
703.  As Jackson has failed to bring forth evidence to satisfy the second element of a claim for
intentional infliction of emotional distress, the Court holds that she has failed to make out a
*prima facie* case for such a claim.  Accordingly, defendants' motion for summary judgment
regarding the second count of the complaint is granted.

## VI.   CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that defendants' motion for summary
judgment regarding all of plaintiff's claims be, and is, **GRANTED**.  All matters in this case
being concluded, it is **ORDERED** dismissed and retired from the Court's docket.

The Clerk is directed to mail forthwith a copy of this Memorandum Opinion and Order to
all counsel of record.

ENTER: April 22, 2005

ROBERT  J.  STARER
SENIOR  UNITED  STATES  DISTRICT  JUDGE